25-1823 Raymond D. Tempest v. Ronald Pennington et al. Counsel for the Appellants, please. May it please the Court, Ashley Burkett on behalf of the Appellant, Mr. Tempest. Your Honor, may I reserve two minutes for rebuttal? Yes, yes you may. Thank you. The egregious misconduct giving rise to this civil suit has been well established by Rhode Island state courts. Mr. Tempest was imprisoned for more than two decades for a crime he did not commit because of prosecutorial and police misconduct in violation of due process guarantees. The only question now is whether there can be any consequences for that misconduct. The district court ruled that Mr. Tempest's claims cannot even go to a jury. That was error for two reasons. First, as to abusive process and vicarious liability, the district court failed to view the evidence in the light most favorable to Mr. Tempest, instead siloing the evidence into arbitrary time periods and refusing to draw reasonable inferences. And second, the district court incorrectly dismissed the municipal liability claim as time-barred based solely on allegations about the conduct of two officers in Mr. Tempest's criminal case. Counsel, can I ask you about the Monell claim? Initially, the district court denied the motion to dismiss, suggesting that further discovery would be appropriate. Then, with respect to the abusive process claims, sort of ruled but said, I'll give allow 30 days to amend the complaint and so forth, and I gather some discovery subsequently took place. But with respect to the Monell claim, did any discovery go forward? No, Your Honor. And if not, why not? Sure. So to set the stage, because I know procedurally this was a little bit irregular, so we amended our complaint to provide further allegations about the abusive process claim. The defendants then filed another motion to dismiss, but that motion was only on abusive process and vicarious liability. It was not on the Monell claim. So we had another hearing on that motion to dismiss, and the court decided to defer ruling on the motion to allow some limited discovery on the involvement of Mr. Pennington and Mr. Rimblatt in the 2017 time period. And so that discovery was completed, and then the motion was renewed. And so at the time, at the hearing on the motion that was eventually converted to summary on the Monell claim, and both parties agreed that the discovery that had been conducted did not relate to the Monell claim. I mean, that's appendix page 445 through 446 and appendix page 476. Was there anything that prevented you from pursuing discovery on the Monell claim? Well, at the time, there was no answer. There had not been an answer on the Monell claim. We had not had the initial discovery conference. So the idea was simply to do the limited discovery on the abusive process claim so that the pending motion on those claims could be resolved. And then we would move forward with discovery on the Monell claim, because it involves a much longer time period and would involve more extensive discovery than what the more narrow time frame that's at issue for abusive process. Were you surprised when the court at that subsequent hearing readdressed the Monell claim in the way that the court did? So the court did inform the parties that they should be prepared to discuss the Monell claim at the hearing and whether the discovery that had been conducted related to the Monell claim. And again, both parties agreed that the discovery did not relate to the Monell claim. And so for there to be some re-judgment on that claim, we would need to do some discovery first. But then the district court reconsidered its statute of limitations ruling on the face of the pleadings, which had not been addressed at the hearing. Thank you. That's helpful. Sure. And so to stick with the minutes... There's nothing wrong... I mean, you may disagree with what the judge ultimately did, but that procedure isn't by itself wrong, right? She can change her mind and say, well, I've thought more about what the meaning of the Superior Court and Supreme Court's decision are, and I think those do actually provide enough notice to put the plaintiff on notice, so I actually think I was wrong, and it runs from that date. That may be legally right or wrong, but that procedure is not a challenge you're making, is it? Correct. A district court can re-evaluate interlocutory rulings at any time, but here, because the court dismissed the claim based on an affirmative defense, the standard was even more favorable to Mr. Tempest. The facts needed to be clear from the face of the pleadings, and we have a situation where the district court looked at the pleadings one time and said, it's not time barred, and then looked at it a second time and reached a different conclusion.  I'm sorry? What's the affirmative defense? Statute of limitations. Oh, that's just the statute, right.  Yeah. Right. And here, again, the district court relied exclusively on allegations, summarizing the Rhode Island Superior Court's findings about the improper witness coaching, and those statements do not clearly establish an accrual date, because that decision only addressed Mr. Tempest's case, and it specifically talked about... So your point is that in a Monell case, you're only on notice when you have information that the problem extends beyond my case, because otherwise it's not a practice, it's just my case? Exactly. And that's what this court held in the Willette versus Beaucray decision, that at a minimum, whether the employment of the officers by the city is enough to give rise to a duty to investigate, that's generally a fact question. And particularly, given that we alleged that the pursuit of Mr. Tempest was really driven by Mr. Rimblad's vindictive pursuit of him based on his own personal reasons, at a minimum, I think there is a fact question about whether that gave reason to suspect that this was part of a larger policy or custom. So we're... This is not really, I guess, a legal issue, but we're in 2026 now, and these events go back to 1992, and if you were to move forward with discoveries, you would... For your purposes, for the Monell claim, the relevant time period is 1992, and your claim is that what happened to your client in 1992 and the subsequent years leading to the prosecution was part of a pattern, a custom of unconstitutional conduct. That's what you would be trying to establish through discovery, going all the way back in time in that way. Is that correct? Yes, Your Honor. Of course, we do have findings already of constitutional violations from Rhode Island state courts. Other cases document such violations, is that what you're... No, the constitutional violations in this case, but you are right that the discovery about the patterns or practices would be related to the 1992 time period and leading up to that trial. Now, if I may also address the abusive process and vicarious liability claims, the district court essentially decided this case on the merits instead of letting contested factual issues go to the jury, and there are genuine issues of material fact as to both elements of the abusive process claim as that claim was formulated by the district court. There are factual disputes about whether Mr. Pennington influenced or participated in the institution of proceedings, and there are factual disputes about whether he influenced or... What do you think shows that he had some forward power in the decision to institute the charges again? Sure. So his influence, I think, can be seen starting with the email on appendix page 295. It was written by Assistant Attorney General Bush, and it's summarizing a call that he had with Mr. Pennington, and now according to the district court, this email expressly disclaims that Mr. Pennington was involved because Mr. Bush tells Mr. Pennington, we will likely sit down in the next couple of weeks and talk about next steps and we'll be in touch, but that merely begs the question, in touch about what? About the decision that they had already made without any consideration of Mr. Pennington's influence or to further discuss the retrial decision, which he was very much invested in. We know that from the fact that they're talking about it in this email. He's concerned that a court has found that he engaged in witness coaching, and the Attorney General's office is seeking to reassure him. Well, counsel, the district court divided the analysis into three phases, the decision to pursue a retrial, the planning for the trial, and then the Alfred plea, and the court said there was no evidence at all about his involvement in the decision to pursue a retrial, no involvement at all with respect to the pursuit of the Alfred, to raise the possibility of an Alfred plea. Some limited evidence with respect to the planning for trial. He apparently, as he had years ago, Mr. Pennington was found to have tried to coach a witness, but then when the government found out about it, they were horrified by that. They told him to cut it out, and that seemed to be the end of it. So if that's all that you have, that involvement in the pre-planning, how was that enough to meet the influence and participated claim? Well, I think there are three types of evidence here from which we can infer his influence. One is parallel conduct, two is evidence of motive, and three is the corrupt conduct, the witness coaching that you just referenced. So in terms of parallel conduct, we know that Mr. Pennington wanted a conviction without a new trial, and that's exactly what happened. Assistant Attorney General Youngs called him before the plea was entered, and Mr. Pennington became emotional and thanked them for this Christmas present, and he said he was on board with that decision. Now, why would he say he was on board if he didn't think he had some influence? And why would a career prosecutor report to his colleagues that Mr. Pennington was on board if he didn't view him as someone with influence? Well, that's not how, I mean, my experience at least tells me that you communicate as the prosecutor with a lot of different people, and you let them know what's happening because it's the proper, you know, it's a good thing to do to keep people informed. But in the end, they are not decision-makers, and they may be happy and they may be sad and they may think it's a Christmas present, but at the end of the day, they have no authority to do anything as far as how this case is going to be resolved, and it's just good practice to keep people in the loop. So why do we have anything more than that, which I think is kind of normal course and not evidence of abusive process? Well, I think whether that's a normal course is for the jury to decide. They may well agree that this was just the normal course, but there is enough here for them to reach the opposite. And what is it besides he's happy? Sure. So we know also there's motive. We know that he's concerned about the witness coaching, that AG's office is aware of that, they're seeking to reassure him, so everybody knows this is a problem for him. And then we get to the witness coaching. Mr. Youngs describes this as a low point in the case for them, and I think that misconduct just demonstrates- Is that by itself, I guess is the part of the case I found most interesting, is that by itself abusive process? So if we accept, which I do think there was evidence, he had some financial motive in this case being resolved, at least not adversely to the government, and he is going out of his way to try to make that happen by coaching, is that perversion? So part of the abusive process is not just initiating, it's perversion. I guess I'm trying to understand what perversion means, and is that perversion? Sure. My time has expired. May I respond?  So it's perversion because it demonstrates, again, that his desire is not to do justice. It's to get a conviction at any cost. And we know that not long after this misconduct, the threat comes from the AG's office. And a reasonable jury could conclude that that threat was made to pervert the judicial process. Again, we have someone who's just engaged in misconduct right under the Attorney General's office's nose that damages their case that's hanging by a thread. And instead of dismissing the case, or at a minimum, cutting Pennington off, we know they don't do that. They're still talking to him. They're emailing him. They're keeping him up to date. And a jury could conclude that the purpose of that threat from the AG's office was not to do justice. It was to protect Mr. Pennington.  Because I have trouble with the threat. Because you can call it a threat. Somebody else would call it a quite good deal, that he's going to get a time-served disposition, and that's favorable to him, and it's a tough choice, and I get that, and people make tough choices. But what if we separate that out and we just look at Pennington trying to coach witnesses because if this goes to trial, what he doesn't want because of his financial motive is not to have this come out adversely to the government. Is that, just that, abuse of process, or is that something else? It's the perversion of the judicial process. He is damaging the case, which leads not long after, to this threat. And instead of dismissing the case, which a jury could find that a prosecutor should do under these circumstances, they didn't do that. They issued this threat, and a jury could find that the purpose of that threat was not to do justice. It was to protect Mr. Pennington and the city. Well, you have a, I mean, you have a causal problem here. I mean, just because they kept him informed of what was going on, as Joe Jaframe is suggesting, that might just be a good practice. Are you suggesting that a jury could infer from that practice that they weren't just being good communicators? They wanted to be sure he was on board, I guess, the language that was used, that they were pleasing him, that for some reason they wanted him to be in agreement with the course of action, that it was more than just innocent communication. It was really placating him for some reason. Is that the inference that you want to draw? Yes, Your Honor. And that really goes to the novel legal question that's presented here, which is, how much involvement must a retired police officer have to be said to have instituted the proceedings and perverted them? And our contention is that influence is enough. And we think that all the facts... Well, the court agreed with you there. I mean, the court said it was adopting the most favorable standard, influence or participation. It did state that, but I think its analysis is much more consistent with a heightened standard. We see the court crediting self-serving testimony from witnesses saying, oh, I wasn't influenced, while not drawing reasonable inferences in Mr. Tempest's favor. We don't need direct admissions in the same way that in an antitrust case, you don't need the parties to say, yes, we colluded. You can look at parallel conduct and plus factors. And that's similar to the type of circumstantial evidence we have here. So, Mr. Pennington was paid, is that correct, for some of the work he did in this pre-planning process? Who paid him? The city of Woonsocket. And is that, from your point of view, is that an important factor as to what his role in the process was? He wasn't just a private citizen. To some extent, he was... Exactly. Yes, he was retired, but he was being compensated by the city. They were well aware of his involvement, and that supports both the vicarious liability claim and also shows that he's not merely a private citizen, you know, just reporting something in good faith. He was a paid adjunct to the prosecution team. He was their star scout. He was the only person who had been involved in this case since 1992. And they couldn't have made the decisions they made without some thought to the help that he would provide and the wrongdoing he had already committed and continued to do in the retrial. Just one final question. So they make a statute of limitations argument as to the abuse of process, which seems to run that this was brought just at three years after the Alford plea, and so that for it to be timely, it has to be the Alford plea that's the abuse of process as opposed to what I questioned you about, which is the prior conduct by Pennington during the planning stage or the initiation stage. Is that right? So the Rhode Island Supreme Court in Hillside Associates v. Stravato says that the abuse of process claim arises when the legal proceeding, although set in most improper form, becomes perverted for the improper purpose. And here, the abuse wasn't complete and the collateral objectives weren't obtained until he took the plea. Up until that time, it could have been hard bargaining. The plea could have fallen apart. They wouldn't have gotten their collateral objectives until the plea was accepted. And that's why the claim accrued on December 18, 2017, when he took the plea. And when did your client learn about the pre-planning witness tampering by Pennington? When were you on notice of that? My understanding is that the prosecutors informed his criminal counsel of Mr. Pennington's coaching of a witness right shortly after it happened. So that would have been before the Alford plea? Yes. May it please the Court. Melody Alger for Appellee Pennington. I'm going to take 10 minutes. My brother will take five minutes on the Monel claim. Your Honors, in this case, I'm going to focus on the abuse of process claim. And here, there's no evidence to support a finding, A, that a perversion of justice actually occurred, and B, that Pennington directed or participated in the perversion that has been identified by the plaintiff, in this case, the appellant. In the plaintiff's amended complaint, and the amended complaint was meant to give them a second bite of the apple to salvage this abuse of process claim. And in the amended complaint, what was alleged, paragraph 291 says, on information and belief, the Attorney General's office consulted with and or was influenced by defendants in deciding to retry Mr. Tempest in 2017. There were three depositions taken in this case that were operative. One was the deposition of Assistant Attorney General Christopher Bush. The other was Assistant Attorney General Patrick Youngs, and the third was Pennington himself. All three deny under oath that Pennington was consulted in or influenced in deciding to retry Mr. Tempest. Paragraph 298 of the amended complaint alleges that the legal proceeding against Mr. Tempest became perverted to accomplish an ulterior or wrongful purpose for which it was not designed in 2017 when the Attorney General's office issued the following threat to Mr. Tempest's  parole. If Mr. Tempest were convicted a second time, it, the Attorney General's office, would recommend an 85-year sentence and object to parole for the rest of his life. In the three depositions that were taken under oath, two officers of the court denied that Mr. Pennington had anything to do with that, had any role or any knowledge of the Alford plea, the perversion of justice that was indicated here. And Mr. Pennington indicated that he gets a call before Christmas, three days before the plea was accepted, to be alerted to the fact that Mr. Tempest was taking a plea. That was the first he had ever heard of the Alford plea being offered here. He had had no – What if the decision to do the Alford plea was motivated by Pennington's misconduct during the pretrial period? What if that were the reason that the prosecutor made the decision to go with the Alford plea slash threat? Well, that's not really how it came about, but that doesn't really make any sense either. The factual evidence is that it was Judge Krause who, after ruling on a number of pretrial motions months after this had happened with this witness out in Boroughville, now Tempest says, you know, this looks a little harder for him because the motion in limine from the state was granted, and three pretrial motions of his were denied, including a motion to dismiss. It was Judge Krause, not the Attorney General's office, and certainly not Pennington, who hadn't spoken to the Attorney General's office in months. It was Judge Krause who suggested the Alford plea. The state assumed that Tempest would take it. Pat Youngs testified in his deposition, it was such a good deal, I couldn't believe this guy wasn't taking it because it would mean no jail time. It was a very good deal for him, and Youngs, it was then when Youngs said to him, you know, I'm going to recommend the maximum sentence like I would in any case, and I'm going to object to parole like I would do in any other case. Separately, Your Honors, I don't think that a prosecutor suggesting that I am going to act in accordance with the law here, I am going to suggest a recommended sentence that complies with the law here, can ever be a perversion of justice. It can't be. I mean, that's the predicate to this entire abuse of process claim is that they were bullied into taking this because of this threat to impose a sentence, a sentence that belonged with the court, or to oppose parole, the parole decision. Well, if it was to suppress, and I'm not saying it was, but if it was to suppress misconduct of an officer, and I'm going to play, one, I'm going to give you a carrot, and I'm going to give this to you because what I want not to happen is the disciplining or discovery of the officer, and that's why I'm going to do this, that seems like a perversion of justice. Well, Your Honor, consider this. Ron Pennington is talking to a witness, Mr. Vaz, and tells him essentially what another witness is going to testify to, to placate this guy who's afraid of testifying. That's what happened in this case. The prosecutors learned about it after it happened, called Pennington and said, stop it, and immediately went to the defense and said, here's what happened, and let me update discovery. So if that's how this played out, and I think that's how this played out, I think we would all agree that that weakens the State's case. It doesn't strengthen it. Well, Counsel, isn't it the, Mr. Tempest's theory that this was, what had happened with Mr. Pennington was a replay of what had happened years ago before the first trial? The authorities in Woonsocket were excoriated by the post-conviction judge for what had been done, and here it's happening again. And so I think their theory is that this repeat of what happened all those years before has so compromised the State's case that they, again, it's because of what Pennington did that it's really compromised their ability to go forward with the trial. So they come up with, and I understand, I guess the judge suggested the Alford plea, but I guess their theory is, well, they said, yeah, maybe that's the way out. Our trial looks very difficult now because of what's happened. Maybe we better go this other direction, and then they threaten him, really, with what's going to happen if they go to a retrial. I mean, I don't subscribe to saying I'm going to seek the max as a threat in this case. I mean, that's what happens in most prosecutions, right? But the remedy is exactly what Mr. Tempest did, which is go to Judge Krause and say, you're the trial judge in this case. Here's what happened in post-conviction relief. Here's what the Supreme Court said. You are the ultimate arbiter of what evidence gets before this jury, and we're asking you, in the interest of fairness, to weigh these issues. And those issues were weighed. And that's when Judge Krause said, I'm going to let this evidence in, I'm not going to let this evidence in, I'm not dismissing your case, and these witnesses can testify subject to your vigorous cross-examination. And frankly, the state has just given you more cross-examination, more impeachment material that you can use. So yes, maybe Tempest certainly, because there was a lot of evidence that pointed to his guilt. So Mr. Tempest rightfully said, with the assistance of four or five attorneys at the time, that maybe an Alford plea is the way to go here. You're basically saying that the Alford plea is the result of, one, Judge Krause making favorable rulings to the government, and on the other side of the coin, the government still knows this is not a great case. This case could go sideways. And so we're going to give him, we're not actually going to go for 85 years, we're going to actually give him time to serve it if he'll take it. And so you're just saying that the facts as they came out put the Pennington, I'll call it the Pennington misconduct, there's no, the causation just is not established.  That the Krause thing sort of supersedes whatever Pennington did as the motivation of the parties and how they end up resolving this. And moreover, the Alford plea suggestion by Judge Krause was after all of those rulings, after all of that had been sorted out, then he says, now I think you should, you know, what about an Alford plea? And it's not, it's not me saying that was the motivation, if I just may finish. It's not me saying that was really the motivation for the Alford plea. It's their own counsel. There's an affidavit, there's a declaration of Michael Kendall in the, I think it was appended to Tempest's objection to the motion to dismiss, which says exactly how it came about that they accepted this Alford plea. It was Judge Krause who suggested it. They had just lost their three motions, one motion to dismiss, two motions in limine. The state had just won its motion in limine. Tempest had just had a dirty drug test, which they said was a false positive. All of these things were influencing them. And then he was facing, you know, a decade in prison. And they thought about it and said, this is what we're going to do. After four or five counsel advised him to do so. Thank you. Thank you. Counsel, I'm going to be unfair to you by asking you a question before you even get started. I didn't even get my name on the record yet, Judge. Well, go ahead and do that. Mark Reynolds for the city of Woonsocket. May it please the court. Judge Lopez. Thank you. I have trouble understanding how the court's second decision, dismissing the Manel claim, is in any way reconcilable with our decision in Ouellette. Because it seems to me what the post-conviction decision of the Superior Court and then its affirmance by the Supreme Court confirmed the misconduct of specific officers in the prosecution of Mr. Tempest's case. But it did not, but those findings did not go at all to the custom practice policy issue that the plaintiffs would have to establish with respect to their Manel liability claim. That would require what we've talked about already, much more extensive discovery. And then in that discovery process, the plaintiff might then be in a position to understand what happened to him as a result of the conduct of the specific officers was reflective of a general custom. The district court did not acknowledge, it seems to me, what a plaintiff has to prove to establish a Manel claim, so I don't understand how the district court's ruling is consistent with the Ouellette precedent. And I'll try to explain to you how I believe it is, Your Honor. I think when you look at the, and this is alleged in the complaint, when you look at the allegations in the complaint about the evidence at the post-conviction relief hearing and the expert testimony at the post-conviction relief hearing, although it's specific to Mr. Tempest's case, the way it's phrased in Judge Procaccini's decision who was the judge on the post-conviction relief decision, and the way the plaintiffs characterize it in their complaint, it's far broader than that. They allege that the superior court found the state violated Tempest's constitutional rights because the Woonsocket Police Department engaged in a widespread pattern of highly improper practices regarding coaching of witnesses for years leading up to the 1992 trial, that's paragraph 188 of the first amended complaint. The complaint references the expert opinions of Commissioner Davis that the investigative techniques used by the Woonsocket Police Department were highly unorthodox and problematic. That's paragraphs 190 and 191 of the complaint. Paragraph 202 of the complaint refers to Judge Procaccini's decision, finding improper police practices to be widespread and that the, quote, taint of improper police procedure so poisoned the well that Mr. Tempest's conviction cannot stand. So it's broader than, you know, Sergeant Pennington didn't do this properly. It's far broader than that. It implies that this is more than just two officers who didn't do their job correctly. And when you look at, and that's in the complaint, that's the way they pled it. And when you look at that, it implies that this is condoned conduct, it's widespread. It deviates from standard procedures, that it's so widespread that it must be condoned by the higher-ups. And in fact, one of the investigating officers, Remblad, was a commander at the time. So he's a high-ranking officer as well. So when Judge McElroy looks at those allegations and she didn't really look at those specific allegations the first time around, and I think that's why she changed her mind, realized she had made an error because she hadn't looked at those specific allegations, you can see that there's enough there that puts this plaintiff on notice that there is a policy, procedure, practice that can give rise to a Manel claim. And if they claim that they needed to do more investigation to find out that it was a policy, practice, or procedure, they didn't put it in their complaint. And if there was more investigation needed, or we didn't know in 2015 when the post-conviction relief petition was granted, we had to do something else to find out what was it. They haven't said that in their brief. They didn't put it in their complaint. So their Manel claim is based upon the post-conviction relief proceedings that concluded in 2015 and were affirmed by the Supreme Court in 2016. And therefore, the statute of limitations ran in 2019, November of 2019. This complaint is filed in December of 2020, more than a year too late. So I believe that Judge McElroy was correct in dismissing the case on the statute of limitations grounds. If there are no other questions, I'm sorry. Thank you. Thank you. So if I may start with the municipal liability claim, it's well settled that a plaintiff does not have to anticipate and rebut a statute of limitations defense in their complaint. Second, the misconduct alleged here was that of two officers in this case. That's not any broader than the facts that were available in Ouellette. That case involved knowledge of more than 20 instances of abuse. The abuser was a captain. The abuser used his position to help the plaintiff with legal trouble. The police department even investigated after he reported. And the abuser was reinstated. And even then, that was not enough to trigger a duty to investigate, particularly because that plaintiff did not know about other victims. And it didn't know that there was any investigation of a broader pattern. But counsel, your opponent has just said that the allegations of your complaint, which was filed beyond the statute of limitations, included allegations that what happened in the prosecution of Mr. Tempest did reflect widespread practices in the department, an allegation that is consistent with what you have to establish under Monell. And I gather his point is, well, you knew enough to make that allegation of a widespread practice. It was a widespread practice by the two officers who were involved in this case, not a widespread action involving the whole department, the whole city. At a minimum, this is a fact question. As to abuse of process, I'd like to respond to the point that the plea came entirely from Judge Krause. There's no evidence, though, that the threat came from Judge Krause. And that's set out in Michael Kendall's affidavit. What, you keep calling it a threat. I mean, it doesn't strike me as, it's hardball. But what makes it a threat? I mean, it's, you can do this, this is good for you. If you don't, I will do these things that are bad for you, which is an incentive by me to negotiate to get you to do what's good for you. That is everyday practice. So what makes it a threat? Well, I would direct the court to Michael Kendall's affidavit. That's at docket entry 17-1. He was Mr. Tempest's criminal counsel in the post-conviction proceeding. And it explains all the circumstances in which the threat was made. And even the district court here noted that while seeking the same sentence may not be unusual. Ensuring that a first time offender who's entitled to parole never gets it is unusual. So I think these questions of is it a threat, is it not a threat, that's for a jury to decide. In the threat, just to put a fine point on it. The threat, if it's a threat, is improperly motivated because the desire of these assistant attorney generals was to conceal misconduct of police. What makes it, it to me, and by itself is not an improper, it's to resolve a case. So what's the part that makes it improper? Because if the purpose of the threat was not to do justice, but to ensure that there was a conviction so that the city and Mr. Pennington could not be liable for civil liability for constitutional violations that had already been found. That's the improper purpose. Okay, thank you. Thank you. Thank you. All rise, the court is in recess.